# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

**Brandon Killings,**

      Plaintiff,

**v.**

**HomeAdvisor, Inc.,**
**a Delaware corporation**

      Defendant.

## Complaint

COMES NOW Plaintiff, Brandon Killings, by and through counsel, Cornish & Dell'Olio, P.C. and for his Complaint against the Defendant, HomeAdvisor, Inc. alleges the following:

### Introduction

1. This is an action brought pursuant to 42 U.S.C. § 1981 and pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, *et seq.*) against HomeAdvisor, Inc. for race discrimination.

### Jurisdiction

2. The Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 2000e-(5).

### Venue

3. The unlawful employment actions described below were committed in the State of Colorado. Venue is proper in the United States District Court for the District of Colorado under 28 U.S.C. § 1391(b).

## Administrative Exhaustion

4. On April 27, 2018 the Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission in Denver Colorado against the Defendant, HomeAdvisor, Inc. for race discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, *et seq.*)

5. Once a Notice of Right to Sue is issued by the United States Equal Employment Opportunity Commission Plaintiff will supplement the record with the date on which the Notice was issued.

## Parties

6. Brandon Killings is an African-American man who was employed by Defendant, HomeAdvisor, Inc. for two years as a Sales Representative.

7. Defendant, HomeAdvisor, Inc. operates a business referral business for home repair contractors.

8. Defendant was at all times relevant to the Complaint engaged in interstate commerce.

9. Defendant was at all times relevant to the Complaint an employer within the meaning of 42 U.S.C. § 2000e(b), employing fifteen or more employees.

10. HomeAdvisor, Inc. is a Delaware corporation doing business in Colorado with its corporate offices at 14023 Denver West Parkway, Suite 100, Golden, Colorado and is in good standing with the Colorado Secretary of State.

## General Allegations

11. Mr. Killings worked for HomeAdvisor, Inc. at a call center located at 9910 Federal Drive, Colorado Springs, Colorado as a Sales Representative for two years.

12. Mr. Killings was a top sales performer for HomeAdvisor and at times was rated as the Number 1 Sales Representative in the call center.

13. During Mr. Killings' employment HomeAdvisor employed few African-American Sales Representatives. At the time his employment ended in 2018 all HomeAdvisor managers in Colorado Springs were white males.

14. The terms and conditions of Mr. Killings' employment were different than those of similarly situated white employees, for example, he never received a pay increase during his employment. Similarly situated white Sales Representatives received a pay increase during a similar term of employment.

15. In other respects the terms and conditions of Mr. Killings' employment were different than those of similarly situated white employees, for example, he was not given access to certain incoming leads (phoned in leads, Web dials and reregistered leads) were by policy to be given to the top sales performers. There were certain metrics Sales Representatives could meet to qualify for these leads which by policy he should have been given as a top sales performer. Other white Sales Representatives with lower performance were given these leads and he was not given these leads.

16. In other respects the terms and conditions of Mr. Killings' employment were different than those of similarly situated white employees, for example, white employees, with the knowledge of management, were allowed to access his pipeline when he was not at work in order to investigate his conduct. Similarly situated white employees did not have their pipeline searched by coworkers when they were not at work.

17. Throughout his employment Mr. Killings was subjected to a racially hostile work environment characterized by racial comments and jokes by white employees, including use of the word "Nigga" in a joking manner by Sean Bostwick, his manager, and music played loudly by the same manager, which repeated the word "Nigga." Mr. Killings was humiliated by behavior of managers toward him, for example, posing him against a wall while being frisked by a white employee for a video shoot and publishing an altered photograph of him titled as the "terminator."

18. Mr. Killings applied for a manager's position in October 2017.

19. Mr. Killings prepared extensively for the panel interview, including preparing a professional Powerpoint presentation which showcased all of the extra work he had performed for HomeAdvisor and his qualifications for the position.

20. The interview was conducted by three managers, all white males.

21. In October 2017 Justin Thomas, a white male, made the decision to give the manager position to Greg Winslow, a white Sales Representative.

22. Greg Winslow was a lower performing Sales Representative than Mr. Killings was, he had been with the company for a shorter period of time than Mr. Killings had been with HomeAdvisor, Inc.

23. Unlike Mr. Winslow, Mr. Killings had been in a Pilot Program for potential managers for nine months before the interview.

24. When Mr. Killings asked Justin Thomas why he wasn't selected Justin Thomas told Brandon Killings that he needed to be more visible.

25. Upon information and belief this was a false reason for denying Mr. Killings the position and was a pretext for racial discrimination. Greg Winslow had not been required to demonstrate "visibility."

26. Brandon Killings was quite well known at HomeAdvisor in October, 2017. A large photograph of him had been displayed on a "wall of fame" for two months recognizing him for the most sales in a pay period. Greg Winslow's picture was not displayed in a similar manner.

27. One of the managers who sat on the panel for Mr. Killings' interview told Mr. Killings that they did not want another "Omar." Omar was at the time a non-white manager at HomeAdvisor.

28. Mr. Killings complained to Sean Bostwick, that he believed that he had been discriminated against because of his race. Mr. Killings stated that if he was lacking in a quality that they were looking for in a manager Mr. Bostwick should have told Mr. Killings.

29.     Mr. Killings asked Sean Bostwick who he needed to speak to about his complaint of discrimination.  Mr. Bostwick said "it's not like that" "We will work on some things to get you there."

30.     Mr. Killings trusted Mr. Boswick's sincerity and followed his advice to increase his visibility.

31.     Mr. Killings did not know that Mr. Bostwick was a racist who referred to him as "that Nigger" and had stated that Mr. Killings would never be promoted.

32.     Mr. Killings did not know that Mr. Thomas was a racist who referred to him as a "thug" based on his appearance and had stated that Mr. Killings would never be a manager at HomeAdvisor.

33.     In the months that followed Mr. Killings coached Sales Representatives in visible locations on a daily basis in order to increase his "visibility."  Mr. Killings made a point to spend his break time in common areas of the building so that others would know him better.

34.     Mr. Killings interviewed again for a manager's position in January 2018.

35.     He prepared extensively for the interview.  He demonstrated that he had become even more visible and was performing more coaching.

36.     Two weeks after the interviews were concluded Mr. Killings saw an email congratulating another person who had been hired as the new manager.  The new manager was a white woman who was an outside hire.

37.     Within minutes of seeing the email Sean Bostwick told Mr. Killings that Justin Thomas wanted to speak to him.

38. Once in the room, Mr. Thomas stated that he had hired someone else. Mr. Thomas asked Mr. Killings if he knew why. Mr. Thomas told Mr. Killings that Mr. Killings' retention rate was low.

39. Mr. Killings had never been told that his retention rate was low. In fact, he had previously been told that his retention rate was high.

40. Mr. Killings pushed back stating that Mr. Thomas had first told Mr. Killings that he was not visible and after Mr. Killings increased his visibility by spending countless hours coaching others, Mr. Thomas had a new reason for not promoting him.

41. Mr. Killings asked what the new manager's visibility and retention were like. Obviously she did not have either high visibility or high retention since she had been hired from outside the company.

42. Justin Thomas also told Brandon Killings that he should dress for the job position of manager. Mr. Bostwick, Mr. Killings' manager, and all white managers in Colorado Springs dressed casually and similarly to Mr. Killings (jerseys, jeans and hats). White employees were not expected to wear traditional business attire.

43. Within a few days of their meeting Justin Thomas began looking for grounds to terminate Mr. Killings' employment.

44. Justin Thomas, without any evidence that Mr. Killings had engaged in any misconduct, decided to have Mr. Killings' employment terminated for misconduct.

45. Justin Thomas approached Clayton Gross, a Data Analyst, and asked him to investigate Mr. Killings. He asked Mr. Gross to dig into Mr. Killings numbers to find evidence of wrongdoing or fraud.

46. It was obvious to Mr. Gross from what Mr. Thomas said that Mr. Thomas' motive was to find some evidence of wrongdoing to justify a termination of Brandon Killings' employment.

47. Mr. Gross reported to Mr. Thomas that Mr. Killings was a good Sales Representative and did not appear to be engaged in misconduct.

48. Mr. Thomas then went to others to find data to support a charge of misconduct.

49. Mr. Thomas would not be deterred in his search for "misconduct" to justify terminating Mr. Killings' employment.

50. Justin Thomas had Shon Payne and Michael Schulte examine all of Brandon Killings' ACH transactions; searching for transactions that had failed to fund "we need success/failure rate for the sales rep, more specifically on SP's that sign up with ACH."

51. Mr. Thomas' purpose was to find a service provider who would say that their ACH transaction had failed to fund (a very common event) because Mr. Killings had done something wrong.

52. Within a couple of days of beginning their investigation Justin Thomas and Sean Bostwick claimed to have evidence of fraud by Brandon Killings and obtained approval from HomeAdvisor's Human Resources office to terminate his employment.

53. After making the decision to terminate Mr. Killings' employment, Mr. Thomas met with Mr. Killings to inform him that they had found fraudulent activity.

54. Justin Thomas who claimed that a customer had called in and claimed that he had not authorized Mr. Killings to sign him up as a service provider.

55. When Mr. Killings asked for the service professional's name and to hear the call, Mr. Thomas said they did not have the call and that they could not give Mr. Killings the name.

56. Mr. Thomas and Mr. Bostwick knew that it was not uncommon for service providers to claim that they had not signed up to be service providers when they changed their minds or if they could not make monthly payments.

57. Mr. Thomas and Mr. Bostwick knew that that, standing alone, the fact that a service provider made a claim that they had not signed up to be a service provider for HomeAdvisor was not evidence of misconduct and by a Sales Representative. In fact, other Sales Representatives had similar claims made against them and had not been disciplined.

58. HomeAdvisor had a practice of employing a progressive discipline process and counseling employees before terminating employees.

59. Mr. Killings' employment was suspended. The following Monday he was called by Justin Thomas and told that his employment was being terminated for "gross misconduct."

60. During the conversation Justin Thomas also claimed that Mr. Killings had written down a customer's credit card number on a piece of paper.

61. Mr. Killings told Justin Thomas that he had never written down a credit card number or broken PCI compliance.

62. Mr. Killings suffered damages including lost income, humiliation, insult to his dignity and emotional distress as the result of the treatment he experienced from managers while employed by HomeAdvisor, the failure to promote him and the termination of his employment.

### First Cause of Action
### (For Violations of 42 U.S.C. § 1981)

63. Plaintiff incorporates paragraphs 1 through 62 herein by reference.

64. Brandon Killings is an African-American protected from racial discrimination by 42 U.S.C. § 1981.

65. Brandon Killings received disparate and hostile treatment as described above while employed by HomeAdvisor was because of his race.

66. The disparate and hostile treatment experienced by Brandon Killings during his employment with HomeAdvisor was inflicted by coworkers and managers.

67. The discrimination suffered by Brandon Killings was sufficiently severe and pervasive to alter the terms, conditions, or privileges of Brandon Killings' employment.

68. At all times relevant Brandon Killings was qualified for the position of manager at HomeAdvisor.

69. Brandon Killings was not promoted to the position of manager because of his race.

70. Other white persons with similar or lesser qualifications were promoted to the manager position after Brandon Killings applied for and was denied promotion.

71.     Brandon Killings was qualified for his position as Sales Representative for HomeAdvisor.

72.     His employment was terminated because of his race.

73.     Defendant's actions and omissions violated Plaintiff's rights secured by 42 U.S.C. § 1981.

## Second Cause of Action
### (For Violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, *et seq.*)

74.     Paragraphs 1 through 73 are incorporated herein.

75.     Plaintiff has exhausted all administrative filing requirements of 42 U.S.C. §§ 2000e.

73.     By the foregoing acts Defendant has violated Title VII by discriminating against Plaintiff because of his race in the terms, conditions and privileges of his employment.

74.     Defendant's actions were taken with malice and reckless disregard for Plaintiff's federally protected civil rights.

## Prayer for Relief

WHEREFORE, Plaintiff prays for the following relief, pursuant to 42 U.S.C. §§ 1981, 1988, and Fed. R. Civ. P. 54:

a. Back pay.

b. Reinstatement

c. Front pay in lieu of reinstatement;

    d. Nonpecuniary and compensatory damages, including damages for humiliation, emotional distress and consequential damages;

    e. Punitive damages;

    f. Pre- and post-judgment interest at the highest rate allowed by law;

    g. Costs and reasonable attorneys fees; and

    h. All other legal or equitable relief to which Plaintiff is entitled.

### Jury Demand

Plaintiff requests this matter be tried by a jury.

Respectfully submitted on this 7th day of March, 2019.

CORNISH AND DELL'OLIO, P.C.

s/ Donna Dell'Olio
Donna Dell'Olio, # 10887
Cornish and Dell'Olio, P.C.
431 N. Cascade Avenue, Ste. 1
Colorado Springs, CO 80903
(719) 475-1204
FAX (719) 475-1264
Email: ddellolio@cornishanddellolio.com
Attorneys for Plaintiff

Plaintiff's Address:
2550 E. Cache la Poudre, Apt 226
Colorado Springs, Co 80909